# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

| | | |
|---|---|---|
| **TOM R. LASHLEY, JR.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **3:06-CV-0110-AJB** |
| | : | |
| **MICHAEL J. ASTRUE,**[1] | : | |
| ***Commissioner of Social*** | : | |
| ***Security Administration,*** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER AND OPINION[2]

Plaintiff Tom R. Lashley ("Plaintiff") brought this action pursuant to sections

205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to

obtain judicial review of the final decision of the Commissioner of the Social Security

Administration ("the Commissioner") denying his application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") Benefits under the Social

---

[1]      Michael J. Astrue, who became Commissioner of Social Security on
February 12, 2007, is "automatically substituted" as Defendant. FED. R. CIV. P.
25(d)(1).

[2]      The parties have consented to the exercise of jurisdiction by the
undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73. [Docs. 9, 15].
Therefore, this Order constitutes a final Order of the Court.

Security Act ("the Act").[3]  For the reasons stated below, the Court **VACATES** the ALJ's disability determination and **REMANDS** the case to the Commissioner to make further inquiry into whether Dr. Maierhofer's opinion is entitled to greater weight and whether it is appropriate to use the grids given Plaintiff's nonexertional limitations.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on June 19, 2003, alleging disability commencing on March 26, 2003.  [Record (hereinafter "R") R49-51].  Plaintiff's application was denied initially and on reconsideration.  [*See* R29-34, 36-39, 325-34].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R40].  An evidentiary hearing was held on June 1, 2006.  [R335-50].

---

[3]      Title II of the Social Security Act provides for federal disability insurance benefits.  42 U.S.C. § 401 *et seq.*  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for supplemental security income benefits for the disabled.  Title XVI claims are not tied to the attainment of a particular period of insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).  Under 42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI.  In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI.  However, different statutes and regulations apply to each type of claim.  Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

2

The ALJ issued a decision on June 29, 2006, denying Plaintiff's claims on the grounds that he had not been under a "disability" from March 26, 2003, through the date of the decision.  [R10-22].  Plaintiff sought review by the Appeals Council and on September 8, 2006, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  [R5-7].

Plaintiff then filed an action in this Court on November 9, 2006, seeking review of the Commissioner's decision.  *Tom R. Lashley, Jr., v. Michael J. Astrue,* Civil Action File No. 3:06-CV-110.  [Doc. 3].  The answer and transcript were filed on February 21 and 22, 2007, respectively.  [Docs. 4-5].  The matter is now before the Court upon the administrative record, the parties' pleadings, the parties' briefs and oral argument, and is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.     STATEMENT OF FACTS

### A.     *Medical Records*

In an April 26, 2002, visit to LaGrange Internal Medicine, Plaintiff complained of bilateral lower extremity swelling, uncontrolled hypertension, and weight gain.  [R122].  He was diagnosed with "DM, uncontrolled,"[4] lower extremity swelling,

---

[4]      "DM" is an abbreviation for "diabetes mellitus."  DAVIS, MEDICAL ABBREVIATIONS, 106 (11th ed. 2003).

3

hypertension, obesity, and hypercholesterolemia (excess cholesterol in the blood).[5] [R122].  On a May 30 follow up, he was encouraged to improve his lifestyle by complying with diet and exercise.  He was told to monitor his glucose and blood pressure.  [R120].

On March 4, 2003, Plaintiff went to the West Georgia Medical Center ("WGMC") complaining of lower back pain after helping move a pump and performing excessive amounts of lifting. [R284].  Plaintiff was found to have musculoskeletal back pain and given a muscle relaxant and pain medication.  He was told to follow up within 48 hours with a medical practice.  [R285].  Plaintiff went to the WGMC because of a cough, cold, and congestion on March 26, 2003.  Plaintiff was told to follow up with his local doctor and advised to stop smoking.  [R283].

On April 8, 2003, Plaintiff presented at the WGMC emergency room with very severe, recurrent chest discomfort.  He was admitted for further evaluation.  Dr. A. L. Cousins gave the following impression: (1) acute coronary syndrome without objective changes; and (2) strong family history of ischemic (heart does not receive enough blood) disease.  [R131].  A left heart catheterization revealed that Plaintiff had

_____

[5]      Except where otherwise noted, the Court has obtained all definitions for medical terms from MedlinePlus, http://medlineplus.gov/ (last visited June 29, 2007).

anatomically normal coronary arteries and "[d]ilated hypo-contractile left ventricle with ejection fraction in the 30% range." [R129-30].[6]  Plaintiff's pain resolved after being given morphine. [R126].  Plaintiff was discharged on April 11 and was prescribed the following medications: Coreg (treats people whose heart does not pump blood well by relaxing blood vessels); Enalapril (blood pressure medication); and lipitor (cholesterol medication).[7]  [R124].

Plaintiff saw Dr. Cousins on May 7, 2003, complaining of increased shortness of breath and feeling pressure on his chest.  [R139].  Dr. Cousins did not see any objective changes.  [R140].  An echocardiogram on May 7 revealed an enlarged left atrium and ventricle and global hypokinesis (abnormally decreased muscular movement).  [R141].  On May 13, 2003, Plaintiff was admitted to the WGMC with

---

[6]    The ejection fraction "refers to the percentage of blood that's pumped out of a filled ventricle with each heartbeat.  This measures the capacity at which your heart is pumping."  A normal ejection fraction is between 55% and 70%, and the ejection fraction may decrease when the heart muscle is damaged due to heart muscle disease, heart attack, or heart valve problems.  *See* MayoClinic.com, *Ejection Fraction: What does it measure?*, http://www.mayoclinic.com/print/ejection-fraction/AN00360/METHOD=print (last visited June 1, 2007).

[7]    Unless otherwise specified, the Court has determined the purpose of medications from MedlinePlus Drugs & Supplements, http://www.nlm.nih.gov/medlineplus/druginformation.html (last visited July 2, 2007).

5

chest discomfort and severe shortness of breath.  [R133].  Dr. Cousins determined that

Plaintiff had dyspnea (shortness of breath), recurrent chest pain, and congestive

cardiomyopathy (disease of the heart muscle in which it has difficulty maintaining

adequate circulation of blood).  [R135].  Plaintiff was discharged on May 15.

His medications were continued, but Dr. Cousins indicated that Plaintiff was prescribed

Paxil (anti-anxiety medication) because of concerns for anxiety disorder.  [R133].

On June 22, 2003, Plaintiff went to the WGMC complaining of chest pressure.

Plaintiff was released the same day with a diagnosis of angina (a disease marked by

spasmodic attacks of intense suffocative pain), stable.  [R275, 277].  Plaintiff was

advised to see Dr. Cousins.  [R277].  Plaintiff went to the WGMC's emergency

department for lower back pain, which was causing walking difficulties.  [R281].

Plaintiff was diagnosed with a sprained back and sent home with Vicodin and Robaxin.

He was told to follow up with his regular doctor.  [R282].

On July 18, 2003, Plaintiff was seen by Dr. Clarence Terrell Alford, Jr., at the

Clark-Holder Clinic.  Dr. Alford determined that Plaintiff had diabetes mellitus 2[8] and

---

[8]     Type 2 diabetes usually develops in adulthood and is marked high blood
sugar (glucose) levels because the pancreas fails to make enough insulin to keep
glucose levels normal.  Symptoms of type 2 diabetes include increased thirst, increased
urination, increased appetite, fatigue, blurred vision, slow-healing infections, and
impotence.  Diabetes is diagnosed when glucose levels after fasting are higher than 126

6

coronary artery disease.  Plaintiff's Hyzaar (blood pressure medication) prescription was refilled.  [R301].

Plaintiff returned to Dr. Cousins on July 23, 2003, complaining of shortness of breath when he was lying down or too hot.  [R137].  Dr. Cousins informed Plaintiff that "he had to become a participating partner in his own health care" because he failed to attend appointments, he took medications prescribed to others, and he gained 22 pounds in 2 months.  Dr. Cousins then asked Plaintiff to reflect on his care and advise the doctor whether he was serious about his health.  [R138].

On August 19, 2003, Plaintiff was admitted at the WGMC emergency department complaining of shortness of breath and chest pain radiating into his left shoulder.  [R143-44].  Dr. Cousins stated that Plaintiff had been employed as a manual laborer but could not tolerate the job and was frustrated by the continued chest pain. Plaintiff had also been referred to a rehabilitation program to guide Plaintiff towards other forms of employment, but Plaintiff resisted this.  Plaintiff admitted that he had not been adhering to medical advice, but indicated that he would begin complying. Dr. Cousins reported that Plaintiff developed diabetes mellitus and his blood sugar was

_____

and when glucose levels without fasting are higher than 200.

7

256 upon admission.[9]  [R145].  Dr. Cousins recommended a second echocardiogram, [R146], and gave the following assessment for Plaintiff: chest pain, diabetes mellitus, congestive heart failure, and hypertension.  [R148].  An echocardiogram revealed that: (1) Plaintiff did not have structural valvular disease; and (2) Plaintiff had left ventricular hypertrophy[10] with some diastolic dysfunction[11] and a reasonably well preserved left ventricular ejection fraction with dyskinetic (a defect in the ability to perform a voluntary movement)[12] apex.   [R149].

Plaintiff was admitted to the WGMC emergency department on August 23, 2003, because of rectal bleeding and shortness of breath.  [R156].  His blood sugar was critically high at 474.  [R157].  An August 25 colonoscopy revealed a sigmoid polyp

---

[9]     A normal blood sugar level is below 100.  *See* MayoClinic.com, http://www.mayoclinic.com/health/blood-sugar/SA00102 (last visited June 6, 2007).

[10]     Left ventricular hypertrophy is the thickening of the heart's main pumping chamber, which increases the risk of heart and blood vessel complications, that is caused by chronic high blood pressure.  MayoClinic.com, *Left Ventricular Hypertrophy*, http://www.mayoclinic.com/health/left-ventricular-hypertrophy/ DS00680 (last visited June 1, 2007).

[11]     Diastolic dysfunction occurs when following a heart contraction, the heart does not relax normally, which can lead to increased pressure and fluid in the blood vessels. *See* American Stroke Association, http://www.strokeassociation.org/presenter. jhtml?identifier=4558 (last visited June 1, 2007).

[12]     *See* Tabers Cyclopedic Medical Dictionary (2002).

8

(polyp in the lower portion of the colon) and internal hemorrhoids.  [R161]. The pathology revealed no malignancy.  Plaintiff was discharged on August 27 with no further rectal bleeding.  [R154].

Plaintiff was again admitted to the WGMC on August 31 because of significant chest pain and abdominal pain with some bleeding.  [R170-71].  A CT Scan of the abdomen revealed a two centimeter abscess next to the sigmoid colon.  [R180]. Plaintiff underwent a procedure to drain the abscess.  [R187].  Plaintiff was discharged on September 11 with the following diagnosis: post sigmoid abscess, improved/stable; stable diabetes, congestive heart failure, and hypertension.  [R166].

On October 17, 2003, Dr. John Hassinger, a state agency doctor, completed a physical residual functional capacity assessment, and determined that Plaintiff could: (1) occasionally lift 20 pounds and frequently lift 10 pounds; (2) sit, stand, and/or walk for 6 hours in an 8-hour day; (3) pull without limitation; (4) occasionally climb stairs/ramps; (5) never climb ladder/rope/scaffolds; and (6) frequently balance, stoop, kneel, crouch, and crawl.  [R192-93].  Dr. Hassinger found that Plaintiff had no manipulative, visual, or communicative limitations, but that Plaintiff should avoid concentrated exposure to hazards.  [R194-95].

9

AO 72A
(Rev.8/8
2)

Another state agency consultant performed a psychiatric review technique on October 27, finding that Plaintiff did not have severe impairments, but he suffered from situational anxiety.  [R199, 204].  As a result, the consultant found that Plaintiff had mild restrictions of daily living, mild difficulties maintaining social functioning, and mild difficulties with maintaining concentration, persistence, or pace.  [R209].

Plaintiff went to the Clark-Holder Clinic on October 21, 2003, complaining of a sore throat and fever.  He was also having cluster headaches.  [R294].  Nurse Practitioner Walker assessed Plaintiff with diabetes, hypertension, cough, "CHF" (congestive heart failure),[13] and sore throat, and referred Plaintiff to neurology for headaches.  [R295].

Plaintiff went to the WGMC on November 6, 2003, for a drug overdose following a fight with his wife.  [R268].  The medical notes indicated that Plaintiff had some shortness of breath and chest pain, which were chronic.  [R269].  Plaintiff was sent to the ICU for monitoring overnight.  Also, he was determined to have congestive heart failure, hypertension which was stable, and diabetes.  [R270-71].  Plaintiff was transferred to the West Central Regional Hospital on November 7, 2003, because of this suicide attempt.  [R213, 293].  Plaintiff saw Dr. Alford at the Clark-Holder Clinic on

---

[13]     DAVIS, MEDICAL ABBREVIATIONS, 77 (11th ed. 2003).

10

November 11 for a follow up.  Plaintiff's blood sugar was 232.  Dr. Alford determined that Plaintiff had diabetes, recent suicide attempt, and anxiety disorder.  [R293].

Plaintiff went to the Clark-Holder Clinic on January 2004 complaining of nerves and that his medications were not helping.  [R290].  Plaintiff's Paxil (anti-anxiety, anti-depression drug) was increased.  [R291].

On January 28, 2004, Dr. Alford completed a mental impairment questionnaire indicating that Plaintiff suffered from anxiety disorder. [R217].  Plaintiff was described as passive and agitated, but that he had normal speech and a flat affect.  [R218].  Plaintiff's thought was apprehensive, and he had borderline intelligence. Plaintiff had normal memory, attention, and consciousness.  [R219].

On February 4, 2004, Dr. Waldo Moore, a state agency consultant, completed a physical residual capacity assessment and found that Plaintiff could: (1) occasionally lift 20 pounds; (2) frequently lift 10 pounds; (3) sit, stand and/or walk for 6 hours in an 8-hour day; (4) push and pull without limitation, [R221], (5) occasionally climb ramps/stairs, but never climb ladder/rope/scaffolds; and (6) frequently balance, stoop, kneel, crouch, and crawl, [R222].  Plaintiff had no manipulative, visual, or communicative limitations, but Dr. Moore determined that Plaintiff should avoid concentrated exposure to hazards.  [R223-34].

AO 72A
(Rev.8/8
2)

On March 4, 2004, Dr. Richard Maierhofer, Ph.D., performed a 3-hour psychological evaluation on Plaintiff.  Dr. Maierhofer described Plaintiff's grooming and hygiene as fair and indicated that Plaintiff sat through the evaluation without problem and could move around the office without difficulty.  Plaintiff was described as cooperative and friendly, but he interacted in a passive manner.  [R229].  Plaintiff exhibited depression and apprehension, and he was quite worried about his health, finances, and future.  At the time of the appointment, Plaintiff was taking Glucovance (type 2 diabetes drug), Lipitor (cholesterol medication), Koreg, Hyzaar, Zantac (acid reflux medication), Enalapril, Xanax (anti-anxiety medication), and Paxil.  [R230].

Plaintiff tested as mildly retarded with a full scale IQ of 66.  He was able to understand directions, but he needed some minimal supervision during testing.  His quality of work was adequate, but he had poor math, vocabulary, perceptual abstract reasoning, and abstract verbal reasoning skills.  His short and long term memory abilities were poor.  Plaintiff read at the third grade level, spelled at a first grade level, and performed math at the third grade level.  [R232].  These skills placed him in the illiterate area, which would cause him to have difficulty handling jobs requiring these abilities.  [R233].  Plaintiff indicated that the pyschotropic medications were beneficial.  Dr. Maierhofer determined that Plaintiff would be able to follow work

AO 72A
(Rev.8/8
2)

rules and to perform and understand basic tasks.  Plaintiff had limited concentration abilities, and he would have trouble dealing with co-workers and supervisors because of depression and difficulty coping with stress.  Plaintiff's reliability on the job would depend on his physical problems.  Dr. Maierhofer provided the following diagnosis: (1) depressive disorder, not otherwise specified, and nicotine dependence on Axis I; and (2) hypertension, obesity, diabetes, and congestive heart failure on Axis III.  As a result, Dr. Maierhofer determined that Plaintiff's prognosis for sustained employment was "very limited" because of Plaintiff's physical abilities and cognitive skills.  [R234].

On April 1, 2004, Dr. Robert Koontz performed a psychiatric review technique and determined that Plaintiff had an organic mental disorder in that he had borderline intellectual functioning and depression disorder, not otherwise specified.  [R235-36, 238].  Dr. Koontz determined that Plaintiff would have mild restrictions of daily living, mild to moderate restrictions in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  [R245].  Dr. Koontz indicated that Plaintiff's anxiety had greatly decreased with medications.  Also, Dr. Koontz believed that Plaintiff's work history suggested that his intellectual functioning was that of adaptive functioning at the borderline intellectual functioning level.  [R248].

13

Dr. Koontz then completed a psychological capacity assessment in which he determined that Plaintiff was moderately limited in the ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain concentration for extended periods; (4) perform activities within a schedule; (5) perform at a consistent pace; (6) interact appropriately with the general public; and (7) respond appropriately to changes in the work setting. [R249-50]. Dr. Koontz stated that Plaintiff was able to understand/recall simple instructions, but his borderline intellectual functioning meant that he would have difficulty with detailed instructions. Also, Dr. Koontz believed that Plaintiff could sustain concentration for simple/familiar activities, but would have difficulty with complex/unfamiliar activities. Further, Dr. Koontz noted that given Plaintiff's "constricted ADL's," decreased memory/concentration, passivity, and depression, Plaintiff would have "some difficulty" with performing within a schedule and working at a consistent pace. Dr. Koontz finally concluded that Plaintiff's IQ and passive personality meant that Plaintiff would have problems sustaining interaction with the general public and Plaintiff would have difficulty with workplace adaptation, especially if change was too rapid or complex. Dr. Koontz noted that none of these limitations were significant/serious. [R251].

14

Plaintiff was admitted to the WGMC on June 22, 2004, with left-side arm pain, left hand tingling, and chest pain. He also complained of cluster headaches. Plaintiff indicated that Dr. Alford was his primary care physician at this time. [R253]. The attending doctor noted that Plaintiff was a known drug seeker. [R254]. Plaintiff was discharged with the following diagnoses: chest pain, cluster headache, diabetes, hypertension, and coronary artery disease. [R253]. At discharge, Plaintiff was told to keep all of his appointments, comply with medications, and comply with a low fat and low salt diet, and he was strongly encouraged to discontinue smoking. [R255]. Plaintiff was given the following medications: Imitrex injectable (migraine headache medication), viscous lidocaine (a product used for numbing pain), and home oxygen as a last resort for cluster headaches. [R255].

Plaintiff was seen by Dr. Alford on August 18, 2004, to follow up his blood sugar, which was "better" at 243. Plaintiff was diagnosed with diabetes mellitus 2, requiring insulin. [R288].

Plaintiff was admitted to the WGMC on September 12, 2004, with non-cardiac chest pain, reflux, and upper abdominal pain.[14] While hospitalized, Plaintiff underwent

---

[14]     The administrative record does not appear to contain all of the medical records for this hospitalization. [*See* R266-68].

15

an esophagogastroduodenoscopy, which resulted in a diagnosis of mild esophagitis (inflammation of the esophagus) and a recommendation of maximizing antireflux therapy. [R266-67]. Plaintiff was discharged with the following medications: Prevacid (anti-reflux medication), Carafate (ulcer medication), Darvocet (pain reliever), Hyzaar, Glucagon, Alprazolam (anti-anxiety medication), Coreg, Seroquel (antipsychotic drug), Lipitor, Paxil, Enalapril, and Lente insulin.  [R265].

On October 21, 2004, Plaintiff was admitted to the WGMC for chest pain.  He had a left heart catheterization on October 25, which revealed normal coronary arteries and normal left ventricular contraction with 65 percent ejection fraction.  [R260]. Plaintiff was discharged on October 26 with the following diagnoses: chest pain without documented organic heart disease; possible neuropathy, which required a pain management specialist; diabetes that was treated with an oral agent; and hypertension that was treated and controlled.  [R257].

Plaintiff was admitted on December 7, 2004, for high blood sugar to the WGMC. Dr. Alford described Plaintiff as "a frequent flyer" at the WGMC. [R261].  Plaintiff

16

was assessed as having obesity, hypertension, and hyperglycemia (excess glucose in the blood) without ketoacidosis.[15]  [R262].

On August 25, 2005, Dr. Warren Henderson saw Plaintiff at the Clarke-Holder Clinic for Plaintiff's diabetes.  Plaintiff complained of his legs giving him problems. Plaintiff indicated that his blood sugars were doing better, reporting that his fasting sugars were around 200, and his lunchtime, dinner, and nighttime sugar levels were around 300.  Plaintiff's glucose was 222 at the examination.  Dr. Henderson determined that Plaintiff had diabetes and neuropathy,[16] which was probably related to his diabetes. [R317].

On this same day, Dr. Henderson wrote a letter indicating that Plaintiff was "currently and permanently disabled" because of several health issues.  Dr. Henderson noted that Plaintiff had hypertension and morbid obesity.  Also, he noted that Plaintiff's diabetes was poorly controlled, leading to severely painful peripheral neuropathy.

---

[15]    Ketoacidosis is a complication of diabetes caused by the buildup of by-products of fat breakdown.

[16]    Diabetic neuropathy is a common complication of diabetes in which nerves are damaged because of high blood sugar levels.  Peripheral nerve injuries develop in stages, such that a person may have intermittent pain and tingling early on in the extremities, which then becomes more intense and constant and finally becomes painless when pain sensation is lost to an area.

AO 72A
(Rev.8/8
2)

Plaintiff glucose level was between 200 to 350, which represented improved but not adequate control.  Plaintiff also had syncopal (fainting) episodes due to his diabetes. Based on these problems, Dr. Henderson believed that Plaintiff could not perform work in a competitive workplace environment.  [R286].

Plaintiff was admitted to the WGMC on August 27, 2005.  At discharge on August 29, Dr. Henderson diagnosed Plaintiff with chest pain secondary to the reflux disease, diabetes, neuropathy, chronic pain, morbid obesity, schizophrenia, hypertension, hyperlipidemia (presence of excess fat lipids in the blood), and coronary angiography with normal coronary arteries.  [R315].

On October 4, 2005, Plaintiff complained that his neuropathy pain had become very severe after an attempt to reduce his Vicodin (pain reliever).  Plaintiff also complained of back and leg pain.  Dr. Henderson reported: "[Plaintiff] apparently has a daughter with cerebral palsy who requires being physically picked up and moved and as a result is chronically lifting, pulling, and tugging." [R314].  Plaintiff's glucose was 349.  He was diagnosed with: (1) furuncles (boils, swelling on the skin) on his right upper extremity and right neck; (2) diabetes; and (3) neuropathy.  [R314].

On November 4, 2005, Plaintiff complained of his legs still aching and a sore tooth.  Plaintiff's glucose level was 522.  Dr. Henderson diagnosed Plaintiff with

18

"Diabetes, uncontrolled." [R313]. Plaintiff returned to Dr. Henderson on January 10, 2006, reporting that his glucose level was better but complaining of back pain and significant leg pain. Plaintiff's glucose level was 120. Dr. Henderson diagnosed Plaintiff with diabetes with neuropathy, chronic back pain, and anxiety/depression. [R312]. On February 10, Plaintiff complained of his feet burning and stated that his glucose was running 300 all day. Dr. Henderson diagnosed Plaintiff with diabetic neuropathy and uncontrolled diabetes. [R310]. Plaintiff saw Dr. Henderson on March 20, reporting that his sugars had improved and were in the 230 range. Dr. Henderson diagnosed Plaintiff with diabetes with neuropathy with suboptimal control. [R309].

Plaintiff saw Dr. Peter Ping Lee on March 27, 2006, for an evaluation of headaches. Plaintiff also reported hand numbness and tingling and neck and low back pain. Plaintiff had normal coordination and normal sensations. His gait and station did not reveal abnormalities, and his strength was 5/5 for all groups. Plaintiff had cervical and lumbar paraspinal tenderness. Plaintiff was diagnosed with a common headache, cervicalgia (neck pain), low back pain, insomnia with sleep apnea. Dr. Lee also wrote that "[c]linically, the condition is worsening." [R305]. On April 11, 2006, Plaintiff complained of both hands being numb and having pain. [R302]. Dr. Lee noted that Plaintiff's EMG/NCS was abnormal. Plaintiff had severe distal median sensory motor

19

neuropathy as seen in carpal tunnel syndrome.  Plaintiff also had right ulnar sensory neuropathy.  [R304].

B.    *Evidentiary Hearing*

At the June 1, 2006, evidentiary hearing, Plaintiff was 36 years old, weighed 300 pounds, and stood six feet tall.  Plaintiff testified that he went to school until the tenth grade, but did not complete the tenth grade.  Plaintiff could read and write "a little bit," but "not much."  Plaintiff lived with his wife and three children.  He would not be able to read or understand a note stating where his family had gone.  Also, he could not write such a note.  [R339].

Plaintiff's last job involved running a heat setting machine where he worked for five years.  Previously, he had worked in a job involving waxing, stripping, and buffing floors.  [R340].  He also had worked a job laying gas lines by digging holes and was a maintenance worker.  [R341].  Plaintiff had to quit his most recent job because his heart problems made him tired all the time and his legs bothered him.  [R343].

Plaintiff testified that he did not pick up or move his disabled daughter, but sometimes he and his oldest daughter would watch the disabled daughter.  Plaintiff occasionally took out the trash, but did not perform other housework.  [R341-42].  To fill his time, Plaintiff walked a little bit, but not much, and watched television.

20

[R342].  Plaintiff could walk for about 60 feet, but no further because he developed

shortness of breath.  [R343].

Plaintiff stated that he usually took insulin twice a day.  He also was diagnosed

with peripheral neuropathy, which led to tingling and sharp pains in his legs, back, and

hands.  [R345].  He also had a lot of cramping in his legs and hands, which made it

difficult for him to sit or walk for long periods of time.  [R345-46].  Plaintiff also had

problems holding items with his hands.  [R345].  Plaintiff also experienced fainting

about once per week or once per month. [R347].  Finally, Plaintiff indicated that he had

problems with his bowel movements once per week such that he could not make it to

the bathroom in time.  [R348].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the
Social Security Act through December 31, 2008.

2.   The claimant has not engaged in substantial gainful activity
at any time relevant to this decision (20 CFR 404.1520(b),
404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: carpal
tunnel syndrom; obesity; diabetes mellitus with neuropathy;
congestive heart failure; depression; and cognitive disorder
(20 CFR 404.1520(c) and 416.920(c)).

21

. . .

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567 and 416.967.[ ] He is capable of lifting, carrying, pushing and pulling twenty pounds occasionally and ten pounds frequently; sitting about six hours in an eight-hour workday; and standing/walking about six hours in an eight-hour workday.   The claimant should avoid hazardous situations.  He is capable of following simple instructions and completing simple tasks.  Normal breaks are sufficient, and the claimant can sustain work on a regular and continuing basis.

. . .

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

7.      The claimant was born on November 17, 1969 and was thirty-three years old on the alleged disability onset date, which is defined as a younger individual 18-44 (20 CFR 404.1563 and 416.963).

22

8.      The claimant has a marginal education and but [sic] to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability due to claimant's age (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), 416.966).

. . .

11.     The claimant has not been under a "disability," as defined in the Social Security Act, from March 26, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

[R14-22].

The ALJ explained in relevant part that none of Plaintiff's impairments met or medically equaled one of the medical listings in 20 C.F.R. Part 404, Subpart P, Appendix I. [R15-18]. With regard to Plaintiff's depression and cognitive disorder the ALJ noted that Plaintiff had mild restriction in daily living activities, mild difficulties with social functioning, moderate difficulties in maintaining concentration, persistence, and pace. The ALJ found, however, that Plaintiff did not meet all of the criteria for listings 12.02 and 12.04. [R17-18].

23

The ALJ observed the following factors in finding that Plaintiff had the residual functional capacity ("RFC") to perform light work.  First, the ALJ found that Plaintiff's statements concerning his alleged symptoms were not credible because he did not take his health care seriously.  Second, the ALJ found that Plaintiff chronically lifted, pulled, and tugged his daughter who had cerebral palsy.  Third, the ALJ found Plaintiff's neuropathy and obesity limited Plaintiff to light work.  Fourth, the ALJ noted that even though Plaintiff was scheduled to have surgery for carpal tunnel syndrome, there was no reason that the surgery would not resolve the problem.  [R19]. Fifth, the ALJ noted that Plaintiff's mental illnesses only resulted in mild limitations of daily living and social functioning and did not affect his ability to interact with the general public. [R19-20].  Sixth, the ALJ observed that Plaintiff's cognitive disorder was not mental retardation as demonstrated by his adaptive functioning and ability to complete Social Security forms without apparent assistance.  Seventh, the ALJ did not give controlling weight to Dr. Henderson's August 2005 opinion because his treatment of Plaintiff started in August 2005 and Dr. Henderson's opinion was on an issue reserved for the Commissioner.  Eighth, the ALJ did not give weight to Dr. Maierhofer's opinion that Plaintiff's prognosis for sustained employment was very limited because it was inconsistent with Plaintiff's history of working for the same employer for six years.

24

[R20].  Finally, the ALJ found that the consulting doctor's findings that Plaintiff had a RFC for light work were entitled to some weight because they were consistent with the medical evidence as well as the second psychological consultant's opinion that Plaintiff had mild to moderate functional limitations since it was generally consistent with the record as a whole.  [R20-21].

The ALJ finally found that although Plaintiff could not perform his past relevant work due to its exertional requirements, Plaintiff could perform jobs that exist in the national economy based on the Medical-Vocational Guidelines ("the grids").  The ALJ recognized that Plaintiff had nonexertional limitations and restrictions that impacted the full range of light work.  However, relying on Social Security Ruling ("SSR") 85-15, the ALJ determined that Plaintiff's additional nonexertional limitations did not significantly erode the occupational base of unskilled light work because he could follow simple instructions and complete simple tasks.  Also, the ALJ recognized that Plaintiff's limitation in avoiding hazardous situations minimally affected Plaintiff's occupational base of unskilled light work pursuant to SSR 85-15.  As a result, the ALJ found that Plaintiff was not disabled under the framework of Medical-Vocational Rule 202.18.  [R21-22].

AO 72A
(Rev.8/8
2)

## IV.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).   The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274,

26

1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity.  *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).   At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments, which significantly limits his ability to perform basic work-related activities.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that the impairment prevents performance of past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  To be considered disabled, the claimant must

AO 72A
(Rev.8/8
2)

prove an inability to perform the jobs that the Commissioner lists. *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).   Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## V.   SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d

28

1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). "Substantial evidence" means more than a scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

29

## VI.   CLAIMS OF ERROR

Plaintiff argues that the Commissioner committed the following seven errors: (1) the Appeals Council failed to give the claimant an opportunity to submit arguments or additional evidence before denying his request for review; (2) the ALJ failed to give proper weight to the treating physician; (3) the ALJ failed to develop the record by obtaining a medical source statement; (4) the ALJ failed to give proper weight to the examining psychologist's opinion; (5) the ALJ failed to follow HALLEX I-2-6-74(B) 1; (6) the ALJ failed to ask the vocational expert ("VE") questions; and (7) the ALJ's decision is not supported by substantial evidence.  [Doc. 10 at 1-2].  The Court addresses these arguments below although in a somewhat different order than presented by Plaintiff.

### A.    Appeals Council

Plaintiff argues that the Appeals Council failed to afford Plaintiff due process because it decided his appeal before providing the usual notice that Plaintiff had 25 days to submit additional arguments and evidence before a decision would be rendered.  [Doc. 10 at 8].

The Commissioner responds that  the evidence submitted to this Court can only be considered to determine whether a sentence six remand is appropriate under

30

42 U.S.C. § 405(g), and that the evidence does not require remand.  [Doc. 12 at 18].

As for the Appeals Council notice form, the Commissioner responds that Plaintiff's

failure to receive additional notice does not require remand because Plaintiff had notice

in that the request for review form signed by Plaintiff's attorney indicated that Plaintiff

needed to submit evidence or legal argument with the form and Plaintiff neglected to

do so.  [*Id.* at 19-20].  As for Dr. Henderson's November 2006 assessment, the

Commissioner argues that although the evidence is new and non-cumulative, the

assessment is not material because the ALJ already rejected Dr. Henderson's opinion

that Plaintiff was disabled.  [*Id.* at 20-21].  The Commissioner also argues that Plaintiff

has not demonstrated good cause for failing to submit Dr. Henderson's assessment to

the ALJ because Plaintiff could have obtained this information prior to the ALJ hearing.

[*Id.* at 21-22].  The Commissioner further argues that if Dr. Henderson's assessment

demonstrates a worsening of Plaintiff's condition after the ALJ decision, it is not

relevant to the time period before the ALJ's decision.  [*Id.* at 22-23].

     Plaintiff replies that his Exhibit A, which is a letter from the Appeals Council

giving notice to a claimant that he had 25 days to file legal arguments and additional

evidence, is relevant because it tends to show that the Appeals Council normally

provides due process.  [Doc. 13 at 2].  Plaintiff therefore contends that without

31

providing Plaintiff a form like Exhibit A, the Appeals Council did not provide notice and an opportunity to be heard.  [*Id.* at 2-3].

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  The denial of Social Security benefits implicates procedural due process. *See Gonzalez v. Sullivan*, 914 F.2d 1197, 1203 (9th Cir. 1990) ("An applicant for social security benefits has a property interest in those benefits."); *Howard v. Apfel*, 17 F. Supp. 2d 955, 966 (W.D. Mo. 1998) ("Social Security disability applicants possess a sufficient claim of entitlement to trigger a protected property interest.") (citing *Dealy v. Heckler*, 616 F. Supp. 880, 884-86 (W.D. Mo. 1984)).  An individual is entitled to some form of a hearing before being deprived of a property interest. *Mathews*, 424 U.S. at 333.  However, due process is flexible and only requires protections that a particular situation demands.  *Id.* at 334.  To determine what process is due, courts must consider the following three factors: (1) the private interest affected by official action; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value of additional or substitute procedures; and

(3) the government's interest, including the function involved and the fiscal and administrative burdens that additional procedural requirements entail.  *Id.* at 335.

The regulations provide that when a party requests Appeals Council review, the claimant should submit "[a]ny documents or other evidence [the claimant] wish[es] to have considered by the Appeals Council."  20 C.F.R. §§ 404.968(a), 416.1468(a). The following regulations also apply in this case: (1) 20 C.F.R. §§ 404.975, 416.1475; and (2) 20 C.F.R. §§ 404.976(b), 416.1576(b).  Sections 404.975 and 416.1475 state:

> Upon request, the Appeals Council shall give you and all other parties a reasonable opportunity to file briefs or other written statements about the facts and law relevant to the case.  A copy of each brief or statement should be filed for each party.

20 C.F.R. §§ 404.975, 416.1475.  Sections 404.976(b) and 416.1476(b) state in relevant part:

> The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision. . . .

20 C.F.R. §§ 404.976(b), 416.1476(b).

The Court concludes that Plaintiff received appropriate notice notwithstanding the Commissioner's failure to send additional notice that Plaintiff could send more information or a statement about the facts of the case.  The regulations do not require

33

any specific procedure for the Commissioner to give notice concerning procedures for appealing an ALJ decision to the Appeals Council, but the regulations instead merely indicate that the Appeals Council will consider legal arguments and additional evidence. Thus, the regulations do not require that Plaintiff be given the notice that he would have preferred, namely a reminder from the Appeals Council that it would consider legal arguments and additional evidence.

Also, the Commissioner gave Plaintiff sufficient notice that legal arguments and additional evidence could be submitted, and the situation did not demand further notice than what was given. In the ALJ's unfavorable decision, the decision stated, "You should submit any new evidence you wish to the Appeals Council to consider **with** your request for review." [R10 (emphasis in original)]. Plaintiff's request for review of a hearing decision also contained the following language:

> If you have additional evidence, submit it with this request for review. If you need additional time to submit evidence or legal argument, you must request an extension of time in writing now. If you request an extension of time, you should explain the reason(s) you are unable to submit the evidence or legal argument now. If you neither submit evidence or legal argument now nor within any extension of time the Appeals Council grants, the Appeals Council will take its action based on the evidence of record.

34

[R8]. Thus, the Commissioner notified Plaintiff twice that he needed to submit any new evidence with the appeal and notified Plaintiff once that he needed to submit legal arguments with the Appeals Council request for review. This is all the notice that is necessary. That the Appeals Council sometimes informs claimants that they may send more evidence or legal arguments does not implicate due process given the notice claimant was already given.[17] With the above notice, there is little possibility that an erroneous deprivation would occur.[18]

Accordingly, the Court finds no reversible error in the Appeals Council's failure to provide Plaintiff with additional notice that legal arguments and additional evidence must be submitted with his appeal.

B.    *Treating Physician*

Plaintiff argues that the ALJ erred in determining that Dr. Henderson was not Plaintiff's treating physician for two reasons. First, Plaintiff asserts that, contrary to the ALJ's finding that Dr. Henderson began treating Plaintiff in 2005, Plaintiff received

---

[17]    The Court further notes that Plaintiff's Exhibit A submitted to this Court appears to have been issued because the claimant requested exhibits from the Appeals Council. There is no evidence that Plaintiff in this case likewise requested exhibits.

[18]    Because Plaintiff's arguments focused on due process, the Court does not consider the Commissioner's sentence six remand argument.

AO 72A
(Rev.8/8
2)

treatment at the clinic where Dr. Henderson worked since July 2003. Second, Plaintiff contends that the ALJ gave more weight to the agency medical consultants who never treated Plaintiff instead of asking Dr. Henderson, who examined Plaintiff, to clarify his disability finding. [Doc. 10 at 9].[19]

The Commissioner argues that substantial evidence supports the ALJ's decision not to give controlling weight to Dr. Henderson's opinion because there is no evidence that Dr. Henderson treated Plaintiff prior to August 2005. The Commissioner notes that Dr. Henderson's employment at the medical facility that Plaintiff attended since 2003 does not impute treating status on Dr. Henderson under 20 C.F.R. §§ 404.1527(d), 416.927(d). [Doc. 12 at 6-7]. Also, the Commissioner argues that medical records demonstrate that Plaintiff was not disabled, including the assessments of the state agency consultants. [*Id.* at 7-8].

Plaintiff replies that Dr. Henderson's note about Plaintiff picking up his daughter is not substantial evidence because: (1) the note is ambiguous; (2) evidence of moving his daughter is not evidence that Plaintiff could sustain activity for 40 hours per week; and (3) Plaintiff testified that his wife picks up his daughter. [Doc. 13 at 3-4]. Plaintiff

---

[19]       The Court addresses Plaintiff's argument that the ALJ should have recontacted Dr. Henderson in a separate discussion below.

36

also argues that Dr. Henderson's disability finding is not a basis to reject his opinion,

despite it being an opinion reserved for the Commissioner, especially given that it was

supported by years of evidence.  [*Id.* at 4-5].  Plaintiff then argues that Dr. Henderson's

opinion of disabled should be given weight because he came to the opinion early in his

treatment and then reaffirmed it in the November 2006 assessment.  [*Id.* at 5].

A treating source is an individual who provides the claimant with medical

treatment or evaluation and who has an ongoing treatment relationship with claimant.

20 C.F.R. § 404.1502.  A treating physician's opinion "'must be given substantial or

considerable weight unless 'good cause' is shown to the contrary.'"  *Crawford v.

Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis* , 125 F.3d

at 1440); *see also* 20 C.F.R. § 404.1527(d)(2); Social Security Ruling ("SSR") 96-2p.[20]

Good cause exists when the "doctors' opinions were conclusory or inconsistent with

their own medical records," or "the doctor's opinion was not bolstered by the evidence,

or where the evidence supported a contrary finding."  *Lewis*, 125 F.3d at 1440.  There

is no good cause when an ALJ credits a consulting physician's opinion over the treating

physician's opinion.  *Id.*; *Bruet v. Barnhart*, 313 F. Supp. 2d 1338, 1346 (M.D. Fla.

---

[20]      Social Security Rulings are binding on all components of the Social
Security Administration.  *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6
(N.D. Ga. 2006).

AO 72A
(Rev.8/8
2)

2004).  Therefore, "a non-examining physician's opinion is entitled to little weight if it is contrary to the opinion of the claimant's treating physician."  *Bell v. Bowen*, 796 F.2d 1350, 1352 (11th Cir. 1986).  However, that a consulting physician's opinion conflicts with a treating physician's opinion is not a reason for remand when the treating physician's opinion is conclusory, other medical evidence does not support the opinion, the opinion conflicts with the treatment notes, or the treating physician is unsure of the accuracy of the opinion.  *See Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991).  The ALJ must clearly articulate the reasons for giving less weight to the treating physician's opinion, *Lewis*, 125 F.3d at 1440, by "always giv[ing] good reasons in the notice of the . . . decision for the weight given to a treating source's medical opinion(s)," SSR 96-2p.  If the ALJ ignores or fails to properly refute the treating physician's opinion, courts in the Eleventh Circuit deem the ALJ's opinion to be true as a matter of law.  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

The Court concludes that substantial evidence supports the ALJ's determination that Dr. Henderson was not Plaintiff's treating physician when Dr. Henderson gave the opinion that Plaintiff was disabled in August 2005.  Prior to August 2005, there is no indication in the record that Dr. Henderson ever treated Plaintiff.  Instead, the record indicates that Dr. Alford was Plaintiff's treating doctor at the Clark-Holder Clinic

AO 72A
(Rev.8/8
2)

before August 2005.  [*See* R253, 288, 293, 301].  Thus, Dr. Henderson was not Plaintiff's treating physician as of August 2005 because he only first examined Plaintiff in August 2005.  [*See* 317].  *See* 20 C.F.R. § 404.1502 (defining a nontreating source as someone who has examined claimant but does not have an ongoing treatment relationship; defining treating source as one who has an ongoing treating relationship with claimant, *i.e.*, the claimant sees the source with a frequency consistent with accepted medical practice); *see also McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (noting that one-time examiners were not treating physicians); *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986).  Although Dr. Henderson was an employee of the Clark-Holder Clinic, this association with the clinic did not render Dr. Henderson Plaintiff's treating physician because the record does not indicate that Dr. Henderson had a prior treating relationship.  *See Misuraca v. Sec'y of Health and Human Servs.*, 562 F. Supp. 243, 246 (E.D.N.Y. 1983) (finding no treating relationship where there were "many doctors servicing plaintiff's frequent visits to the outpatient clinics").  Substantial evidence therefore supports the ALJ's decision that Dr. Henderson was not the treating doctor as of August 2005, so the ALJ was not obligated to give controlling weight to this opinion.

AO 72A
(Rev.8/8
2)

The Court is unpersuaded by Plaintiff's argument that Dr. Henderson's November 2006 opinion, submitted to this Court as Exhibit B, which provides a detailed evaluation from Dr. Henderson, bolsters Dr. Henderson's August 2005 opinion that Plaintiff was disabled. In reviewing whether the Commissioner erred in making a determination, this Court only considers evidence before the ALJ. *See Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998) ("[W]hen the [Appeals Council] has denied review, we will look only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence."). Thus, the Court cannot consider the November 2006 medical opinion in determining whether the ALJ erred in deciding not to give controlling weight to Dr. Henderson's August 2005 opinion.

As a result, the Court concludes that substantial evidence supports the ALJ's decision to not give controlling weight to Dr. Henderson's August 2005 opinion.[21]

Although Dr. Henderson was not Plaintiff's treating doctor as of August 2005, Dr. Henderson was an examining doctor at this time. The regulations state that an ALJ is required to consider the medical opinions in a claimant's case record. 20 C.F.R.

---

[21]     The Court notes that the record indisputably shows that Dr. Henderson became Plaintiff's treating doctor thereafter. [*See* R309-10, 312-14, 317].

§ 404.1527(b).  The regulations state, however, that the ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." The Commissioner is responsible for determining whether an individual is disabled. *Id.* § 404.1527(e)(1); SSR 96-5p.  As a result, the ALJ will not give weight to a doctor's finding that a claimant is disabled.  *See* 20 C.F.R. § 404.1527(e)(1), (3).  However, a medical opinion about a claimant being disabled "must not be disregarded."  SSR 96-5p.

In the instant case, Dr. Henderson stated in August 2005 that Plaintiff was "currently and permanently disabled" because of several health issues.  [R286].  Since this conclusion was clearly on an issue reserved for the Commissioner, the ALJ did not have to accord the opinion any special significance.  *See* 20 C.F.R. § 404.1527(e)(3); SSR 96-5p.  Also, the ALJ clearly considered Dr. Henderson's opinion in the ALJ decision.  [*See* R20].  Therefore, the Court finds no error in the ALJ's consideration of Dr. Henderson's opinion.

Accordingly, the Court **AFFIRMS** the ALJ's treatment of Dr. Henderson's August 2005 opinion.

41

C.     *Recontacting Dr. Henderson*

Plaintiff argues that the ALJ should have sought a specific opinion from Dr. Henderson instead of disregarding the opinion. [Doc. 10 at 10]. Plaintiff claims that had the ALJ recontacted Dr. Henderson, he would have received a highly favorable opinion to Plaintiff, thereby requiring remand for the ALJ to consider the opinion. [*Id.* at 12]. The Commissioner argues that the ALJ's decision to reject Dr. Henderson's opinion did not trigger a duty to recontact Dr. Henderson because the record was adequate and there was nothing Dr. Henderson could say to alter the fact that the evidence did not support his opinion. [Doc. 12 at 9]. Plaintiff replies that Dr. Henderson's November 2006 assessment would have been evidence before the ALJ made any decision "in a fair disability hearing process." [Doc. 13 at 6].

The regulation concerning recontacting a treating source provides in relevant part:

> (e) Recontacting medical sources. When the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.
>
> (1) We will first recontact your treating physician . . . to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when

42

> the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. . . .

20 C.F.R. § 404.1512(e). This regulation only applies to a treating source. *See Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). Courts of appeal have generally interpreted this regulation as requiring the ALJ to recontact a treating doctor only when the evidence received from the medical source is inadequate and prevents the ALJ from making a disability determination. *See Johnson v. Barnhart*, 138 Fed. Appx. 186, 189 (11th Cir. 2005) ("Medical sources should be recontacted when the evidence received from that source is inadequate to determine whether the claimant is disabled.").[22]

---

[22]    *See also Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006) ("The regulations do not require an ALJ to recontact a treating physician whose opinion was inherently contradictory or unreliable," especially "when the ALJ is able to determine from the record whether the applicant is disabled."); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("An ALJ is required to recontact a doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability determination."); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled."); *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001) (noting that the ALJ has a duty to recontact the treating physician only when evidence from the treating physician is inadequate, not when the ALJ rejects the treating physician's opinion). *But see Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (holding the ALJ had a duty to recontact the treating medical source for

43

Thus, where the administrative record contains many records that provide the ALJ with

a basis to make an informed disability determination.  *See Sultan v. Barnhart*, 368 F.3d

857, 863 (8th Cir. 2004).[23]

––––––––––––––––––

clarification of his opinion before rejecting it as failing to provide sufficient support for
conclusions).

    [23]    The Court notes that the Commissioner's Social Security Rulings,
provide:

> Because treating source evidence (including opinion evidence) is
> important, if the evidence does not support a treating source's opinion on
> any issue reserved to the Commissioner and the adjudicator cannot
> ascertain the basis of the opinion from the case record, the adjudicator
> must make "every reasonable effort" to recontact the source for
> clarification of the reasons for the opinion.

SSR 96-5p.  Therefore, there are three components to this SSR in determining whether
to recontact a medical source: (1) the treating source's opinion is unsupported by the
evidence; (2) the opinion is on an issue reserved for the Commissioner; and (3) the ALJ
cannot determine the basis for the opinion.  *See id.*

    Initially, the Court notes that there appears to be an inconsistency between the
regulation and SSR 96-5p in that the SSR appears to require the ALJ to recontact
treating doctors in more circumstances than the regulation requires.  The regulation
requires recontact only when evidence from the treating source is inadequate to
determine whether the claimant is disabled.  *See* 20 C.F.R. § 404.1512(e).  The SSR
appears to have a more liberal rule for recontacting treating sources in that it requires
the Commissioner to recontact if the evidence does not support a treating source's
opinion on any issue reserved to the Commissioner.  Courts have determined, however,
that "SSR 96-5p should be construed in conjunction with" § 404.1512(e).  *Jackson v.
Barnhart*, 368 F. Supp. 2d 504, 507 n.1 (D.S.C. 2005); *Frost v. Barnhart*, No. 03-215,
2004 WL 1529286, at * 11 (D. Me. May 7, 2004).

AO 72A
(Rev.8/8
2)

The Court concludes that the ALJ did not err in failing to recontact Dr. Henderson. The Court notes that Dr. Henderson provided sufficient medical records to determine whether Plaintiff was disabled. Besides providing the opinion that Plaintiff was disabled, Dr. Henderson also provided treatment notes and diagnoses between August 2005 to March 2006 concerning Plaintiff's physical and mental conditions. [R309-17]. This record evidence along with the other evidence from Dr. Alford, the WGMC, and the state agency consultants provided the ALJ with sufficient information to determine whether Plaintiff was disabled. As a result, the ALJ was not under any duty to recontact Dr. Henderson.

Accordingly, the Court **AFFIRMS** the ALJ's decision not to recontact Dr. Henderson.

---

This Court agrees. The SSR is based on § 404.1512(e). *See* SSR 96-5p (noting that citations relied upon in drafting the SSR include § 404.1512). The regulation, § 404.1512(e)(1), creates a threshold requirement for triggering the ALJ's duty to recontact, namely a duty arises only when the record is inadequate to make a disability determination. Although it is possible that the Commissioner may have created a more rigorous rule for the ALJ to apply than the regulations for disability proceedings, the Court finds that the better approach is to read the SSR in line with the regulations and the court opinions interpreting the regulations. As a result, the Court will not apply SSR 96-5p differently than the regulations and instead concludes that the duty to recontact exists only when the evidence from the medical source opinion is inadequate for the Commissioner to determine whether the claimant was disabled.

45

CASE HEADER

D.     *HALLEX*[24]

Plaintiff argues that the ALJ erred because he failed to explain why the VE was present as required by HALLEX I-2-674 B 1.  [Doc. 10 at 14].  The Commissioner responds that this error does not require remand for two reasons.   First, the Commissioner contends that HALLEX requirements are not legally binding pursuant to *Moore v. Apfel*, 216 F.3d 864 (9th Cir. 2000).  [Doc. 12 at 13-14].  Second, the Commissioner asserts that even if an error to follow HALLEX could lead to remand where the claimant suffers prejudice, as suggested by *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000), there was no prejudice to Plaintiff by the ALJ's failure to explain the VE's presence because he was represented by counsel at the hearing.  [*Id.* at 14].  Plaintiff replies that the *Moore* decision is not binding law, and that the Fifth Circuit's decision standard of determining prejudice for HALLEX errors should instead apply. [Doc. 13 at 7].  Plaintiff also contends that he was prejudiced because the ALJ's failure

---

[24]      HALLEX is the Hearings, Appeals and Litigation Law manual. It "conveys guiding principles, procedural guidance and information to the Office of Hearings and Appeals (OHA) staff," "includes policy statements," and "defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the Hearing, Appeals Council and Civil Actions levels." HALLEX I-1-0-1.

46

to follow HALLEX caused the ALJ to ignore the treating physician opinion and to rely on the grids instead of questioning the VE.  [*Id.* at 7-8].

The Eleventh Circuit has never addressed whether the Commissioner's failure to follow HALLEX is grounds for remand.  The Ninth Circuit has determined that HALLEX does not carry the force of law, so it is not binding on the agency and correspondingly does not create judicially enforceable duties.  *See Parra v. Astrue*, 481 F.3d 742, 749 (9th Cir. 2007).   As a result, the Ninth Circuit does not review allegations of noncompliance with HALLEX.  *Id.*; *Moore*, 216 F.3d at 869.  The Fifth Circuit agrees that HALLEX does not carry the authority of law.  *Newton*, 209 F.3d at 459.  The Fifth Circuit will review, however, allegations that the Commissioner erred in following procedures in HALLEX, but will only find reversible error where the claimant shows that he "was prejudiced by the agency's failure to follow a particular rule."  *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001).  The Fifth Circuit does so because it has previously "held that 'where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required.'" *Newton*, 209 F.3d at 459 (quoting *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. Sept. 9, 1981)).

47

For purposes of Plaintiff's case, the Court assumes that the Fifth Circuit's prejudice standard applies and considers Plaintiff's HALLEX argument.[25]  The Court finds, however, that this argument does not provide grounds for relief because Plaintiff did not suffer any prejudice.  Under HALLEX, "the ALJ must advise the claimant of the reason for the VE's presence and explain the procedures to be followed" at the hearing.  HALLEX I-2-6-74(B).  At the start of the hearing the following exchange occurred:

> ALJ:         This hearing is now open in the case Tom Lashley, Social Security number . . ., June the 1st, 2006.  The Claimant is present in Columbus, Georgia along with his attorney, Margaret Johnson.  I'm conducting this hearing by video from Norfolk, Virginia.  Also, present in Columbus is Sue Turner, who is a

---

[25]     The Court observes that the Eleventh Circuit might follow the Fifth Circuit standard.  In holding that a violation of a HALLEX procedure may entitle a claimant to relief if the claimant demonstrates prejudice, the Fifth Circuit relied on a former Fifth Circuit opinion, *Hall v. Schweiker*, decided on September 9, 1981.  *See Newton*, 209 F.3d at 459.  The Eleventh Circuit has adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).  Since the Fifth Circuit relies on a former Fifth Circuit opinion in holding that HALLEX violations may be considered, it is possible that the Eleventh Circuit might apply the Fifth Circuit standard.  *But see McCoy v. Barnhart*, 309 F. Supp. 2d 1281, 1289 (D. Kan. 2004) (concluding that HALLEX provisions are not binding and do not provide a basis for the court to rule and finding the Fifth Circuit's reliance on *Hall v. Schweiker* in *Newton v. Apfel* to be misplaced because *Hall* dealt with a Social Security Ruling, not HALLEX).

48

vocational expert.  Ms. Johnson, have you explained the nature of this hearing and the issues in this case?

ATTY:      Yes, sir, I have.

ALJ:       Mr. Lashley, you've got an experienced attorney there with you.  She tells me that she's talked to you about what we're doing here today.

CLMT:      Yes, sir.

[R337].  The ALJ clearly indicates that the VE was present.  Plaintiff is not prejudiced by the ALJ's failure to explain the purpose of the VE's presence for two reasons.  First, the ALJ determined that Plaintiff's counsel had explained the proceeding to him.  As a result, it was reasonable for the ALJ to assume that Plaintiff's counsel had explained the hearing procedures and the role of the hearing participants, including that of the VE. Thus, there was no reason for the ALJ to repeat information that Plaintiff's counsel presumably imparted to Plaintiff.

Second, even if Plaintiff's counsel had not explained the VE's purpose, Plaintiff was represented by experienced counsel.  Experienced counsel should have known the VE's purpose and how to elicit testimony from the VE.  The ALJ even provided an opening for Plaintiff's counsel to question the VE or request the ALJ to question the VE when the ALJ asked Plaintiff's counsel if she had anything further at the end of the

49

hearing. [*See* R349]. Instead, of requesting to question the VE, counsel opted to allow the hearing to end. [*Id.*]. Therefore, Plaintiff cannot claim prejudice given that he was represented by experienced counsel at the hearing and that counsel deemed it unnecessary to question the VE or to have the ALJ question the VE.

Plaintiff claims that prejudice exists because the failure to explain the VE's purpose led to a series of other errors. However, there is no evidence that the ALJ's failure to explain the VE's presence caused any further error. Instead, the other alleged errors by the ALJ are a result of the ALJ's alleged misunderstanding of the evidence or alleged improper application of the law, not the ALJ's failure to advise Plaintiff of the VE's purpose for being at the hearing.

Accordingly, the Court **AFFIRMS** the ALJ's decision to the extent that the ALJ failed to identify the purpose of the VE as required by HALLEX I-2-6-74(B).

E.      *Examining Psychologist*

Plaintiff argues that the ALJ should have given greater weight to Richard Maierhofer, Ph.D., who performed a psychological examination of Plaintiff than to the non-examining agency psychologists. [Doc. 10 at 13-14]. The Commissioner responds that the ALJ properly considered Dr. Maierhofer's opinion regarding Plaintiff's poor prognosis for sustained employment because it was inconsistent with Plaintiff's work

50

history and the opinion of Dr. Koontz, the state agency consultant, which the ALJ found to be more consistent with the overall evidence.  [Doc. 12 at 11-13].  Plaintiff's reply brief relies on the arguments in his initial brief.  [Doc. 13 at 6].

The Commissioner evaluates every medical opinion that is received.  20 C.F.R. § 404.1527(d).  In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treating relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in claimant's case record.  20 C.F.R. § 404.1527(d)(1)-(6).  "The law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (citation and internal quotation marks omitted); *see also* 20 C.F.R. § 404.1527(d)(1); *Crawford*, 363 F.3d at 1159 (indicating that a treating physician's opinion is not accorded great weight when contrary evidence exists). The opinion of a one-time examiner is not entitled to deference.  *Crawford*, 363 F.3d at 1160; *McSwain*, 814 F.2d at 619.  A non-examining doctor's report should be given

51

little weight when it contradicts that of an examining doctor's report. *Edwards*, 937 F.2d at 584; *see also Swindle v. Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990) (stating that a non-examining physician's opinion is entitled to little weight); *Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985) (according "little weight" to a non-examining physician's opinion if it contradicts the opinion of the only physician to examine the patient). Thus, the ALJ should generally give greater weight to the examining physician's report than a non-examining physician's. *See Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985). However, opinions from state agency consultants may be given greater weight than the opinion of treating or examining sources "[i]n appropriate circumstances." SSR96-6p. Where the ALJ gives greater weight to the non-examining source, the ALJ must give cause for not affording considerable weight to the non-examining doctor. *Sharfarz v. Bowen*, 825 F.2d 278, 280-81 (11th Cir. 1987).

The Court concludes that the ALJ did not evaluate properly Dr. Maierhofer's opinion that Plaintiff's "very limited" prognosis for sustaining employment. The Court agrees that Plaintiff's six-year tenure with one employer demonstrates that his mental impairments by themselves would not (and did not) preclude Plaintiff from sustaining employment. But, Dr. Maierhofer's opinion did not give his prognosis only on the

52

basis of Plaintiff's borderline intellectual functioning.  Dr. Maierhofer gave Plaintiff a "very limited" prognosis for sustained employment "because of [Plaintiff's] *physical difficulties* and limited cognitive skills." [R234 (emphasis added)].  The ALJ's decision to reject Dr. Maierhofer's opinion does not address the physical difficulty portion of the prognosis.  The medical record clearly indicates that Plaintiff was suffering from hypertension, diabetes, and chest pain by the time that Dr. Maierhofer saw Plaintiff. [*See, e.g.*, R143-45, 148, 166, 293, 295].   There is no evidence that Plaintiff experienced these impairments while he was working with the same employer for six years.   In fact, the evidence suggests that Plaintiff was not suffering from these impairments during his employment because Plaintiff testified that he stopped working because of fatigue due to his heart problems.  [R343].  Also, the ALJ appears to at least agree that Plaintiff's physical impairments have some affect on Plaintiff's capacity to work because the ALJ determined that Plaintiff could not perform his past relevant work.  [*See* R21].  Since the ALJ's finding discounting Dr. Maierhofer's prognosis ignored part of the reasoning behind the prognosis, *i.e.*, that Plaintiff's physical problems also were responsible for the poor work prognosis, the Court finds that the ALJ erred in discounting Dr. Maierhofer's opinion.

53

To the extent that the Commissioner argues that Dr. Koontz's opinion should be given greater weight because it was better supported by the medical record, the Court disagrees.   First, the Court notes that Dr. Koontz's opinion was, like the ALJ's, premised on Plaintiff's past work history, which the Court finds to be an insufficient reason by itself to reject Dr. Maierhofer's prognosis.  [*See* R248].  Second, Dr. Koontz does not discuss what affect Plaintiff's own physical problems would have on Plaintiff's ability to work.  [*See* R248, 251].  As a result, the Court cannot find that Dr. Koontz's opinion is sufficient to provide the ALJ substantial evidence in rejecting Dr. Maierhofer's opinion.

Accordingly, the Court **REVERSES** the ALJ's decision to discount Dr. Maierhofer's opinion.

F.      *Vocational Expert v. Medical Vocational Guidelines*

Plaintiff argues that the ALJ erred by not questioning the VE.  [Doc. 10 at 14]. Plaintiff appears to argue that Plaintiff's counsel at the administrative hearing did not question the VE because: (1) the ALJ's failure to question the VE is normally an indication that the claimant will be found disabled; and (2) most ALJs "roll their eyeballs" when an attorney questions the VE in these situations.  [*Id.* at 15].  Plaintiff asserts that had the ALJ asked the VE questions, Plaintiff's counsel would have been

54

on notice to ask questions.  As a result, Plaintiff asserts that the ALJ's failure to question the VE "was sneaky and simply unfair."

The Commissioner responds that the ALJ appropriately examined the Medical-Vocational rules instead of consulting the VE because.  [Doc. 12 at 14-17]. The Commissioner contends that Plaintiff's nonexertional limitations of avoiding hazardous situations did not prevent Plaintiff from performing a full range of light work activity pursuant to SSR 85-15.  [*Id.* at 16].  Also, the Commissioner argues that Plaintiff's limitations of unskilled work, following simple instructions, and completing simple tasks did not prevent Plaintiff from performing a full range of light work activity because there is no evidence that Plaintiff was unable to perform the basic demands of unskilled work.  [*Id.* at 16-17].  The Commissioner concludes that because the ALJ properly considered the grids, Rule 202.18 demonstrated that jobs existed in the national government that Plaintiff could perform.  [*Id.* at 17].

Plaintiff replies that the ALJ's application of Grid Rule 202.18 was improper because the rule only applies, *inter alia*, where the claimant is literate and the claimant's maximum sustained work ability is limited to sedentary work.  Plaintiff asserts that there is no evidence that Plaintiff is literate or that Plaintiff can sustain sedentary activities.  [Doc. 13 at 8-9].  Plaintiff also contends that where the ALJ

55

violates HALLEX, it is not fair to mislead Plaintiff and rely on Grid Rule 202.18. [*Id.* at 9].

The Medical-Vocational Rules ("grids") are predicated on an individual having an impairment that manifests itself by limitations in the strength requirements of a job. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e).  The Eleventh Circuit has described the grids as follows:

> The grids are a series of matrices which correlate a set of variables - - the claimant's residual functional capacity (*i.e.*, the ability, despite impairments, to do sedentary, light, etc. work), age, educational background, and previous work experience.  Upon the entry of a set of these variables into the appropriate matrix a finding of disabled or not disabled is rendered.

*Gibson*, 762 F.2d at 1520.  The Commissioner is directed to apply the grids when a claimant: (1) is not performing substantial gainful employment; (2) has a severe medically determinable impairment that prevents the claimant from performing past relevant work; and (3) the findings of fact concerning the claimant's vocational factors and RFC is the same as the corresponding criterion of a grid.  20 C.F.R. § 404.1569; 20 C.F.R. Pt. 404 Subpt. P, App 2 § 200.00(a).

"The general rule is that . . . the ALJ may use the grids to determine whether other jobs exist in the national economy that a claimant is able to perform." *Phillips*

AO 72A
(Rev.8/8
2)

*v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004).  The grids will not apply when an

individual has combined exertional limitations[26] and nonexertional limitations,[27] "unless

there is a rule that directs a conclusion that [the claimant is] disabled based upon [his]

strength limitations; otherwise the [grids] provide a framework to guide [the] decision."

20 C.F.R. § 404.1569a(d); *see also* 20 C.F.R. Pt. 404 Subpt. P, App 2 § 200.00(e)(2);

SSR 83-14.  Thus, the grids may still be applicable when there are exertional and

nonexertional limitations.  *Sryock*, 764 F.2d at 836.  "'[N]on-exertional limitations can

cause the grid to be inapplicable only when the limitations are severe enough to prevent

a wide range of gainful employment at the designated level.'"  *Id.* (quoting *Murray v.*

*Heckler*, 737 F.2d 934, 935 (11th  Cir. 1984)).  Therefore, the ALJ must "'make a

specific finding as to whether the nonexertional limitations are severe enough to

preclude a wide range of employment at the given work capacity level indicated by the

---

[26]    "Exertional limitations affect an individual's ability to meet the seven strength demands of the job: sitting, standing, walking, lifting, carrying, pushing, and pulling." *Phillips*, 357 F.3d at 1242 n.11 (citing SSR 96-4); 20 C.F.R. § 404.1569a(b).

[27]    "Nonexertional limitations or restrictions affect an individual's ability to meet the other demands of jobs and include mental limitations, pain limitations, and all physical limitations that are not included in the seven strength demands." *Phillips*, 357 F.3d at 1242 n.11 (citing SSR 96-4); 20 C.F.R. § 404.1569a(c) (providing the following examples of nonexertional limitations: difficulty functioning because of depression; difficulty maintaining concentration or attention; and difficulty understanding or remembering detailed instructions).

exertional limitations.'" *Welch v. Bowen*, 854 F.2d 436, 439 (11th Cir. 1988) (quoting *Sryock*, 764 F.2d at 836). Thus, the grids are not used when: (1) "the claimant has a nonexertional impairment[28] that significantly limits his basic work skills[29]"; or (2) "the claimant cannot perform a full range of employment at the appropriate level of exertion.[30]" *Wolfe v. Chater*, 86 F.3d 1072, 1077 (11th Cir. 1996); *Phillips*, 357 F.3d at 1242. In such a situation, the ALJ should rely on a VE's testimony to determine whether Plaintiff can perform any jobs in the national economy. *Wolfe*, 86 F.3d at 1077-78; *see also* 20 C.F.R. § 404.1567(e) (indicating that a VE may be used

---

[28]      The Court notes that case law uses exertional and nonexertional "impairments" nearly interchangeably with exertional and nonexertional "limitations." *See, e.g.*, *Phillips*, 357 F.3d at 1242 n.11 ("There are two types of impairments at issue in [claimant's] case: exertional limitations and nonexertional limitations."). The Commissioner defines a nonexertional impairment as "one which is medically determinable and causes a nonexertional limitation of function." SSR 85-15. Thus, if there is a nonexertional limitation, a claimant will have a nonexertional impairment.

[29]      Nonexertional impairments significantly limit basic work skills when they "prohibit a claimant from performing 'a wide range' of work at a given work level." *Phillips*, 357 F.3d at 1243; SSR 85-14 ("Nonexertional impairments may or may not significantly narrow the range of work a person can do."). A VE must testify when the nonexertional impairments significantly limit basic work skills. *Id.*

[30]      "Full range of employment" is defined "as being able to do 'unlimited' types of work at the given exertional level." *Phillips*, 357 F.3d at 1242. When a claimant cannot perform a full range of employment at a sedentary level, the ALJ must use a VE. *Id.*

AO 72A
(Rev.8/8
2)

when there is an issue of "whether a [claimant's] work skills can be used in other work and the specific occupations in which [the skills] can be used."); *Jones*, 190 F.3d at 1229.

As the above discussion suggests, "the grids may be used in lieu of vocational testimony on specific jobs if none of the claimant's nonexertional impairments are so severe as to prevent a full range of employment at the designated level." *Wolfe*, 86 F.3d at 1078 (quoting *Passopulos v. Sullivan*, 976 F.2d 642, 648 (11th Cir. 1992)); *see also* SSR 85-15 (indicating that a mental impairment will not affect a claimant's ability to perform unskilled work where claimant can (1) understand, remember, and carry out simple instructions, (2) respond appropriately to supervision, coworkers, and usual work situations, and (3) deal with change in the work setting routine); SSR 83-14 ("A particular additional exertional or nonexertional limitation may have very little effect on the range of work remaining that an individual can perform").  Also, the ALJ can use the grids in the presence of nonexertional impairments when a claimant's complaints are not credible.  *See Martin v. R.R. Retirement Bd.*, 935 F.2d 230, 234 (11th Cir. 1991) (citing *Francis v. Heckler*, 749 F.2d 1562, 1566-67 (11th Cir. 1985)).[31]

---

[31]      "Because '[t]he provisions of the Railroad Retirement Act are so closely analogous to those of the Social Security Act . . . regulations and cases interpreting the latter are applicable to the former.'" *Martin*, 935 F.2d at 234 n.4 (quoting *Elam v. R.R.*

The Court initially rejects the following four arguments advanced by Plaintiff. First, the Court finds no merit to Plaintiff's arguments concerning the ALJ being "sneaky." As the above discussion of the law demonstrates, an ALJ need not question a VE when an ALJ relies on the grids. Thus, that the ALJ did not question the VE should not cause an attorney to assume that the ALJ will rule in a claimant's favor. As Plaintiff recognizes, Plaintiff's counsel had the opportunity to question the VE. The ALJ asked Plaintiff's counsel if there was anything further, and counsel said, "No, sir, that's all I have." [R349]. Plaintiff's counsel's failure to pursue questioning of the VE is counsel's fault, not the ALJ's. Regardless of whether ALJs "roll their eyeballs" at questions to the VE where the ALJ does not initiate the VE questioning, this "eyeball rolling" should not be a factor for an attorney whose presence is to represent her client. The Court is completely unpersuaded by Plaintiff's arguments concerning the ALJ's "sneaky" actions.

Second, the Court is unpersuaded by Plaintiff's argument that the ALJ erred in determining that Plaintiff was literate. To the contrary, Plaintiff indicated in his disability report that he could read English and could write more than his name in English. [R66]. Also, an interviewer, who questioned Plaintiff about his disability

_____

*Retirement Board*, 921 F.2d 1210, 1213 (11th Cir. 1991)).

60

claim, indicated that there was no indication that Plaintiff had difficulty reading.  [R77].

Finally, as the ALJ observed, it appears that Plaintiff completed the Daily Living

Questionnaire, which required that he read questions and then respond to them either

with check marks or by writing sentences.   [R79-84].   Substantial evidence clearly

supports a finding that Plaintiff is literate.[32]

    Third, the Court rejects Plaintiff's argument concerning sedentary work.

The ALJ applied grid Rule 202.18, which applies to light work, not exclusively

sedentary work as the Plaintiff appears to believe.  [*See* R21].  *See* 20 C.F.R. Pt. 404,

Subpt. P, App. 2 § 202.18(e) (falling under Table 2, which applies to light work).  Also,

the ALJ's finding that Plaintiff could perform light work automatically meant that the

ALJ found that Plaintiff could perform sedentary work.  *See, e.g.*, 20 C.F.R. Pt. 404,

Subpt. P, App. 2 § 202.00(a) ("The functional capacity to perform a full range of light

work includes the functional capacity to perform sedentary as well as light work.").

Therefore, contrary to Plaintiff's assertion there is evidence that Plaintiff can sustain

sedentary activities.

---

[32]    The Court recognizes that Plaintiff testified that he could not write much, [R339], and Dr. Maierhofer indicated that Plaintiff's language and math skills placed him in the illiterate area, [R233], but this evidence does not nullify the other substantial evidence that Plaintiff was somewhat literate.  *See Barron*, 924 F.2d at 230.

Fourth, the Court rejects Plaintiff's argument concerning HALLEX. As discussed above, Plaintiff was not prejudiced by the ALJ's failure to follow HALLEX. The Court fails to comprehend how such an error automatically renders the grids inapplicable.

Although the above arguments are meritless, the Court concludes that the ALJ erred in using the Medical Vocational Guidelines instead of consulting a VE. The ALJ specifically found that Plaintiff had the following nonexertional limitations: (1) Plaintiff had to avoid hazards; and (2) Plaintiff was capable of following simple instructions and completing simple tasks. [R18]. The ALJ also appeared to give weight to Dr. Koontz's assessment, [*see* R21], which found that Plaintiff had the following additional nonexertional limitations: (1) moderately limited ability to maintain attention and concentration for extended periods; (2) moderately limited ability to perform activities within a schedule; (3) moderately limited to perform at a consistent pace; and (4) moderately limited ability to respond appropriately to the changes in the work setting. [R249-50].[33] [34] It is true that the need to avoid exposure

---

[33]     Dr. Koontz also found that Plaintiff had moderate limitations in his ability to interact with the general public. [R250]. The ALJ appears to have rejected this finding when he stated that "there is no evidence that the claimant cannot tolerate interaction with the general public." [*See* R20]. There is no indication that the ALJ rejected the other nonexertional limitations found by Dr. Koontz. The ALJ does state

AO 72A
(Rev.8/8
2)

that "[t]he overall medical evidence does not substantiate the allegations of work disabling limitations." [R20]. But, the ALJ also gives weight to Dr. Koontz's conclusions without explicitly rebutting any of them except the limitation dealing with the general public. As a result, the Court can only conclude that the ALJ meant to adopt all other limitations found by Dr. Koontz. *See* 20 C.F.R. § 404.1527(f)(2)(ii) (requiring the ALJ to explain weight given to state agency consultant opinion).

[34]    At oral argument, the Commissioner argued, in response to inquiry by the undersigned that the worksheet portion of Dr. Koontz's mental RFC lent support to Dr. Maierhofer's conclusions, that the ALJ does not consider the worksheet portion of the mental RFC assessment. In *Lembke v. Barnhart*, No. 06-C-0306-C, 2006 WL 3834104 (W.D. Wis. Dec. 29, 2006) (R&R), the magistrate judge explained the Social Security POMS relating to the summary conclusions on the Mental Residual Functional Capacity Assessment and their relationship to the actual functional capacity assessment:

>    It is not surprising that the ALJ did not include in his RFC determination each of the moderate or marked limitations found by the state agency consulting psychologists: the commissioner has specifically instructed her adjudicators not to do so. The agency's Program Operations Manual System (POMS) provides that the purpose of having state agency consultants complete "Summary Conclusion" portion of SSA-4734-SUP is "chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities and the claimant's or beneficiary's degree of limitation for sustaining these activities over a normal workday and workweek on an ongoing, appropriate, and independent basis." POMS DI 25020.010B.1.

>    Although the manual indicates that these summary conclusions relate the basic mental demands of work, it goes on to instruct adjudicators that they should not use these summary conclusions as the RFC assessment but rather should use the narrative RFC assessment written by the consultant. As demonstrated by this case, however, state agency consultants do not always complete the narrative section of the

_____

form, and even if they do, they often do not explain how they arrived at their RFC determination. Are the goals sought to be achieved by having state agency consultants complete the "Summary Conclusions" checklist worth the amount of litigation these checklists generate? One might hope that the commissioner is considering better alternatives for evaluating mental RFC.

*Lembke,* 2006 WL 3834104, at * 11 n.6.

The POMS provision concerning this worksheet states, in relevant part:

> NOTE: The purpose of section I ("Summary Conclusion") on the SSA-4734-F-SUP is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities and the claimant's or beneficiary's degree of limitation for sustaining these activities over a normal workday and workweek on an ongoing, appropriate, and independent basis. *It is the narrative written by the psychiatrist or psychologist in section III ("Functional Capacity Assessment") of form SSA-4734-F4-Sup that adjudicators are to use as the assessment of RFC.* Adjudicators must take the RFC assessment in section III and decide what significance the elements discussed in this RFC assessment have in terms of the person's ability to meet the mental demands of past work or other work. This must be done carefully using the adjudicator's informed professional judgment.

*See* https://s044a90.ssa.gov/apps10/poms.nsf/lnx/0425020010!opendocument (last visited July 5, 2007) (emphasis supplied).

Courts have routinely determined that the POMS are not binding. *Stroup v. Barnhart*, 327 F.3d 1258, 1262 (11th Cir. 2003); *Johnson v. Sullivan*, 735 F. Supp. 416, 422 n.5 (M.D. Fla. 1990) ("The POMS, however, is meaningless from a judicial point of view because it has no legal force and does not bind the Secretary.") (citing *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981), which stated, "But the Claims Manual is not a regulation. It has no legal force, and it does not bind the SSA. Rather, it is a

_____

13-volume handbook for internal use by thousands of SSA employees, including the hundreds of employees who receive untold numbers of oral inquiries like respondent's each year"); *see also Tejada v. Apfel*, 167 F.3d 770, 775 (2d Cir. 1999); *Greenspan v. Shalala*, 38 F.3d 232, 239 (5th Cir. 1994); *Parker for Lamon v. Sullivan*, 891 F.2d 185, 190 (7th Cir. 1989) ("The POMS manual has no legal force and therefore the standard cannot be controlling in this case."); *Hickman v. Bowen*, 803 F.2d 1377, 1380 n.6 (5th Cir. 1986) ("However, although the POMS may provide us with some useful insights, it has no legal force and does not bind the courts. [citing *Hansen*]. As a handbook representing internal policy, the POMS cannot answer the question before us; it simply informs us of present operating procedures of HHS employees."). *But see Howard v. Astrue*, No. 06-96, 2007 WL 951389 at * 4 (D. Me. Mar. 27, 2007) (R&R) (rejecting plaintiff's argument of error because the POMS direct the adjudicator to consider the narrative written in section III, not the summary conclusions).

Nonetheless, courts have considered arguments relating to the POMS. *See Stroup*, 327 F.3d at 1262 ("While the POMS does not have the force of law, it can be persuasive."); *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991) ("The POMS directives are useful in considering the unique situation presented in post-polio cases, but the impairment that must be demonstrably met or equaled remains one listed in Appendix 1 to Subpart P."); *Butterworth v. Bowen*, 796 F.2d 1379, 1387-89 (11th Cir. 1986) (considering POMS argument raised by Commissioner); *see also Binder & Binder PC v. Barnhart*, 481 F.3d 141, 151 (2d Cir. 2007) ("A POMS entry might arguably be evidence of the SSA's public construction of its authorizing statute or the Commissioner's own regulations, a construction that, if consistent with that statute, would be entitled to some level of deference."); *Hartfield v. Barnhart*, 384 F.3d 986, 988 (8th Cir. 2004) ("While these internal rules [i.e., the POMS] do not have legal force and do not bind the Commissioner, courts should consider them in their findings."); *Tejada*, 167 F.3d at 775 ("However, in this case, we cannot be sure whether the ALJ applied the Regulations or the POMS to his determination of the appellant's claim. Because of this ambiguity, we agree with the appellant that the circumstances of this case warrant our attaching some weight-although not controlling weight-to the podiatrist's report "because although the regulations prohibit use of a podiatrist report, the POMS do not."); *Avery v. Sec'y of Health and Human Servs.*, 797 F.2d 19, 23-24 (1st Cir. 1986) ("We therefore construe POMS DI T00401.570 as being the latest word

65

on departmental pain policy, committing the Secretary and superceding any inconsistent discussion and examples."); *Evelyn v. Schweiker*, 685 F.2d 351, 352 n.5 (9th Cir. 1982) ("Because we believe that there is adequate support elsewhere for our holding in this case, we only mention POMS as additional support; we need not address the disputed matter of the precise legal force or persuasiveness of these guidelines. Suffice it to say that while the guidelines do not have the force and effect of law, they are not of absolutely no effect or persuasive force.") (citations omitted).  According to *Phillips v. Barnhart*, 421 F. Supp. 2d 272, 279 (D. Mass. 2006), "the administrative law judge's analysis [of the RFC] must be 'consistent with the interpretive guidelines set forth in the POMS instructions.'" (quoting *Da Rosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986)).

The Court need not, and does not, determine whether the POMS at issue in this case prevents an ALJ from considering a state agency consultant's worksheet in the mental RFC form.  An argument can be asserted that the POMS in this case merely directed, but did not prohibit, an ALJ from considering portions other than just Section III.

In any event, applying the POMS to the issues in this case, if Dr. Koontz in section III of the mental RFC assessment form did not list all of the nonexertional limitations found in the worksheet portion of the assessment, then, according to POMS, there was no error insofar as applying the grids based on Dr. Koontz's opinion, because under the POMS the ALJ only had to consider section III.  Thus, if Dr. Koontz's section III assessment only listed two nonexertional limitations - - simple work and hazards - - then one cannot say that the ALJ failed to consider nonexertional limitations found by Dr. Koontz given that the POMS only direct the ALJ to consider this portion of the assessment.

Practically speaking, however, the Commissioner's position creates at least two problems for reviewing courts.  First, as noted at oral argument, the state agency consultants frequently write illegible, or at best shorthanded, statements in section III, making them extremely difficult if not impossible for the reviewing court to read.  [*See* R251].  The Court is at a loss to see how an ALJ, with a far greater caseload than the undersigned, can devote the amount of time necessary to decipher, if possible, these

66

to hazards is a nonexertional limitation that generally will not significantly erode the occupational base and prevent application of the grids.  *See* SSR 85-15.  However, Plaintiff's nonexertional limitations (as found either explicitly or implicitly by the ALJ) extend beyond this one nonexertional limitation involving hazards.

The ALJ found that Plaintiff could perform unskilled competitive employment. [R22 & n.10].  An individual can perform unskilled, competitive employment when he is able to: understand, carry out, and remember simple instructions on a sustained basis;

---

narrative entries.

Second, even if the section III assessment is legible, the consultant (in this case, Dr. Koontz) does not generally explain in his section III analysis why he rejected certain nonexertional limitations that he found in the worksheet.  Third, as the *Lembke* R&R suggests, the worksheet provides evidence favorable to the Plaintiff, and the ALJ cannot reject this favorable evidence without explaining why he refused to reject certain nonexertional limitations found on the worksheet.

Second, and most important, notwithstanding the worksheet nature of the first section of the mental RFC assessment, the ALJ still erred because he never explained why the nonexertional limitations from the worksheet did not apply to Plaintiff.  At first blush, such a conclusion appears to contradict POMS policy which directs ALJs only to section III.  However, an ALJ must consider all evidence in the record, both favorable and unfavorable.  The regulations do not distinguish between worksheet evidence and section III evidence (even if the Commissioner stated that the Court should).  The ALJ must discuss the worksheet evidence.  Therefore, in giving weight to Dr. Koontz, the Court deems that the ALJ gave weight to all portions of the opinion, even those expressed in the worksheet.  He needed to explain why these nonexertional limitations still allowed the grids to apply.

AO 72A
(Rev.8/8
2)

respond appropriately to supervision, coworkers, and usual work situations; deal with changes in the work routine. SSR 85-15. However, Dr. Koontz's opinion to which the ALJ gave weight determined that Plaintiff was moderately limited in his ability to maintain concentration, perform activities in a schedule, work at a consistent pace, respond appropriately to changes in the work setting. [R249-50]. These nonexertional limitations, which the ALJ implicitly adopted, appear to affect Plaintiff's ability to perform unskilled competitive employment as it is defined in SSR 85-15. For instance, Plaintiff's moderate limitation in dealing with changes in the work routine means that Plaintiff would not deal well with all changes in the work routine. Also, Plaintiff's problems with concentration suggest that Plaintiff is unable to understand, carry out, and remember simple instructions on a sustained basis. As a result, the ALJ cannot simply state that Plaintiff's "nonexertional mental impairments do not have a significant impact on the full range of unskilled light work" given that the ALJ has implicitly determined that there are nonexertional limitations that would affect the Plaintiff's ability to perform competitive unskilled employment. [*See* R22]. Instead, the ALJ specifically needed to "determine in the first instances whether such [ ] restriction[s] significantly limit[ed Plaintiff's] basic work skills; that is, whether there are a wide range of [light skilled] jobs that do not require" these other nonexertional

68

limitations.  *See Phillips*, 357 F.3d at 1243-44.  The ALJ therefore erred in relying on the grids without making these findings.

Accordingly, the undersigned **REVERSES** the ALJ's use of the grids.

G.      *Substantial Evidence*

Plaintiff finally argues that the ALJ's decision is not supported by substantial evidence.  First, Plaintiff contends that without VE testimony, there is no substantial evidence to support the ALJ's finding that Plaintiff could find work that exists in significant numbers in the national economy.  [Doc. 10 at 15-16].  Second, Plaintiff contends that by accepting the opinions of non-examining experts over those of Dr. Henderson and Dr. Maierhofer, the ALJ did not have substantial evidence to make the disability finding.  Finally, Plaintiff concludes that there is simply no substantial evidence to support the ALJ's disability determination.  [*Id.* at 16].  The Commissioner responds that as discussed elsewhere in his brief, the substantial evidence supports the ALJ's disability determination.  [Doc. 12 at 18].  Because the Court has found that the ALJ erred in evaluating Dr. Maierhofer's opinion and in exclusively relying on the grids, the Court will not address these arguments advanced by Plaintiff.

69

## VII.   CONCLUSION

Pursuant to this Court's power to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405 (g),[35] the Court **VACATES** the ALJ's disability determination and **REMANDS** the case to the Commissioner to make further inquiry into whether Dr. Maierhofer's opinion is entitled to greater weight and whether it is appropriate to use the grids given Plaintiff's nonexertional limitations.

The Clerk is **DIRECTED** to enter judgment for Plaintiff.

**IT IS SO DIRECTED AND ORDERED**, this the 5th day of July, 2007.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[35]      "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

AO 72A (Rev.8/82)